Case No. 17-5989 and Case 18-5086 L H et al. v. Hamilton Co Dept of Education et al. Argument not to exceed 15 minutes per side. Mr. Bennett, you may proceed for the appellant. Good morning, Judges. May it please the Court, I'm Scott Bennett here this morning on behalf of the Hamilton County Board of Education. With the Court's permission, I'd like to reserve 60 seconds for rebuttal. Judges, the case before you this morning is arguably the most important special education case that the Sixth Circuit has considered in the past 35 years. Because here, you have the opportunity to consider two issues that are of overriding importance, not only to students, but also to special educators. First, this Court must consider the standard that governs a decision of an educator to move a child from the general education setting to a more specialized setting where the educators can pursue a meaningful educational benefit with appropriately ambitious goals as envisioned by Andrew F. Second, this Court has the opportunity to affirm its long-standing decision in Campbell v. Centerland Board of Education in which this Court held that an educator who, acting in good faith, if he or she makes an error in judgment regarding a placement decision, that educator does not thereby violate Title II of the Americans with Disabilities Act or Section 504 unless there's a showing of intentional discrimination. With the Court's permission, I'd like to take a look first at that issue dealing with placement. So the long-standing precedent here in the Sixth Circuit has been the Ronker decision. And the Ronker decision rests upon the Supreme Court's earlier decision in Rowley which, under the unique facts of that case, requires school districts to provide an education program for students that pursues some educational benefit. And so based upon that holding, the Sixth Circuit held that when a child is being considered to be moved to a more restrictive placement, that move would be inappropriate if the child is receiving some educational benefit. Now, we respectfully suggest that the fundamental nature of that principle changed markedly in 2004 when this Court then decided the case of Diehl. Because in Diehl, the Court had the chance to take a look at this Rowley standard and ask, does the IDEA, the Individuals with Disabilities Education Act, really envision just some benefit for these children or is it something more? And in fact, this Court decided that really to serve the purpose behind the IDEA, a school district needed to provide a meaningful educational benefit by which this Court determined that you look at the abilities of the child and the potentialities of the child, and you craft something that really reached beyond some simple benefit. Isn't this all a factual determination of what's meaningful or what's some? As long as we've determined the district court has applied the law or recognized the law in Diehl and Ronker, why aren't we just to defer to the findings here of the district court that this was as to what was meaningful in this context? Great question, Judge Busch. And so for two reasons. First, a question of faith, whether something is a free and appropriate public education, is in fact a mixed question of law and fact. And so not only does this Court have to determine what the standard is, but more to the point, this Court has to determine whether the district court correctly applied the correct standard. But reaching beyond that, Andrew F. makes it very clear that, Andrew F., of course, is the Supreme Court's recent decision on this issue, makes it very clear that courts need to defer to the educational expertise of teachers because teachers understand the pedagogy, they understand the child, and they, in their professional judgment, understand what is meaningful under the circumstances. And in this particular case, the district court did actually find that there was some benefit that L.H. was receiving in the general education setting. Well, there are two problems with that. First is the wrong standard. Under Diehl and Andrew F., that benefit actually has to be meaningful to that child. And second... The district court here did cite Diehl and actually emphasized the word meaningful in the quote. So wasn't the district court applying the Diehl standard? Actually, Your Honor, no. And, in fact, the district court makes that... It does cite Diehl, but it doesn't analyze Diehl under the prong of whether the educational benefit is meaningful. And that's actually clear on page 23 of the district court's opinion. The district court makes clear that there are essentially two standards that are at issue. There's the ronker standard, which is what the district court accepted, and then there's the Diehl standard, which looks at meaningful educational benefit. And then the district court states explicitly that it's going to follow the ronker standard. And so the district court actually recognizes in its opinion that there is this tension between these two standards. And we suggest that the district court should have reconciled that tension and revised ronker to consider that the benefit at issue has to be meaningful with respect to that child. What's the difference between some and meaningful? Well, some is simply more than de minimis. Isn't that meaningful if you have some of something? Well, Your Honor, the court in Diehl rejected that argument. That was actually an argument that was advanced by the school system in Diehl. And the district court—I'm sorry, the court of appeals said, no, the aim is more than just some. That issue was explicitly considered in Andrew F. as well. And the finding was that some isn't sufficient. The mark here is we have to have appropriately ambitious goals worked into the IEP that are calculated to pursue academic and functional advancement. And with regard to that, deference has got to be given to the educators because the educators understand whether one particular skill is a skill or whether it's really meaningful because it lays the foundation for further advancement. And that's really the core here. The district court recognized that there was some advancement, but the teachers said, yeah, the progress that L.H. made in his second grade year wasn't meaningful because he wasn't acquiring the skills necessary to move forward educationally and functionally. For instance, while he could count through ordinal numerals fairly high, he could not demonstrate one-to-one number correspondence with objects. So he could call a number, but he couldn't translate that number to a count of objects. And as a matter of fact, while the child was at the Montessori School, whereas L.H. had been able to demonstrate one-to-one number correspondence to the number 15, at the Montessori School, after two years, he was still unable to get past 16. And so the educators, based upon their judgment, concluded that the minimal progress he made was not meaningful. It didn't lay a foundation for advancement in terms of education or functionality. And again, NGREF reminds us that is a determination for educators to make. Another reason that we have to defer to these educators, Your Honor, is because fundamentally there are some clearly erroneous findings by this district court. First of all, the district court completely misunderstood the context of the teacher's testimony due process because the plaintiff's claims shifted on appeal to the district court. And from the face of the due process record, that's obvious. The second clearly erroneous finding, Your Honors, is that the district court made the assumption that this child fits into the typical learning profile of every other student who has Down syndrome. And that simply isn't the case. There is no such thing as a typical child with Down syndrome. There is a learning pattern that these students have. But the undisputed evidence from a speech and language pathologist was that this child did not fit within that profile. And so the expert opinions of Dr. Buckley and Dr. Whitbread, which would be relevant for a typical child with Down syndrome, don't apply to this child. And these educators, because they had educated this child for so long, were well aware that what might have worked for other students with Down syndrome didn't work with this child. And that's a critically important point. Your Honors. Is there evidence of any other Down syndrome children in the school? Not in this record, Your Honor. And again, when you look at the IDEA, we look at individuals. And so what a particular child is capable of doing is a unique inquiry. Diehl says this has to be a fact-specific inquiry regarding this particular child. And NGREF reinforces that. We don't look at a one-size-fits-all approach to educating students with any disability. And as a matter of fact, that was a point made in Diehl that we cannot predetermine on the basis of a disability. What I'm reading in the record, it seems like when the child was taken out to this or was going to be placed in the CDC arrangement, am I correct that the child was the highest-functioning student in the CDC that he would be placed into? No, Your Honor. That's actually not true. The record actually demonstrates that there were many other students in CDC who functioned more independently than this child. That's very clear in the record. It is true that he had some splinter skills that were better than many other students. But in terms of independent work, he actually was very low-functioning. And actually, you can see that in the videos submitted as part of the record where he's at the Montessori school, and the crux of that move was intended to be to pursue a more inclusive education. And in fact, what you see is the child is unable to function, even with a preschool video, without heavy support, heavy intervention, and heavy redirection by his aide. And then when he's in the classroom, what you see is more of the same. He's dependent upon his aide to stay on task. And truthfully, when you're thinking about achieving functional advancement, that's the core of the problem. The child did not have the work skills to be able to pursue that. And the idea of the CDC placement would have been to help lay the foundation of building blocks so that he could advance academically, but also to help the child develop the work skills so that he could stay on task. That is a vitally important issue for this court to bear in mind. Let me ask you this question. Yes, Your Honor. What makes this case difficult is that it's easy to understand how the parents fail the way they do, and it's easy to understand how the school board takes the position they do. Nobody is outrageous in this case. And so my question based on that is that if the whole situation is kind of an equilibrium, and I know you will argue that it isn't, but if it is, isn't there kind of a bit of a thumb on the scale that directs you to go to mainstreaming? Your Honor, no, because while that is an assumption, it's a policy assumption of Congress, federal law makes also very clear that we mainstream to the maximum extent appropriate. And the appropriateness is a function of where can the child achieve a meaningful educational benefit. And what we have right now is we have a tension between the DEAL standard and the Ronker standard, and it's a tension that this court simply has to resolve because we have one substantive standard under developing the IEP, what is meaningful, and we have another standard under placement. And respectfully, that is a decision educators simply have to make because they understand what a child needs in order to advance. And I would also suggest, Your Honor, that whether the benefits of a more restrictive placement can be imported into a general education standard also requires courts to defer to educators because, as in this case, they know what they had already tried. So is there any place for the parents or for the experts who disagree with the educators? Oh, of course, Your Honor. But in this case, and I see I have a minute remaining, in this case, Your Honor, is that the experts were unfamiliar with this child. They assumed that this child fit within a profile to which he did not fit, and the experts wrote the reports having never actually seen over 1,300 pages of data prepared by Hamilton County Schools. Dr. Whitbread reviewed 700 pages of data the day before the hearing. She said it didn't make sense to her, and that's probably because she didn't see the other 600 pages of data. And so, yes, there's absolutely room for parents and their experts to disagree, but they have got to know about the child, and in this case, that simply didn't happen. Your Honor, in the time remaining, if I may, I'd like to sum up. We're asking this court to affirm the district court on the issue of reimbursement, which, fortunately, we briefed heavily because we didn't have a chance to present that point here this morning. We're asking this court to reverse the district court on the other remaining issues and to find that the Ronker standard must be revised to factor in the Meaningful Educational Benefits Standard of Deal and the Appropriately Ambitious Standard of NDREF. We also believe that the Ronker standard needs to be revised to take into account the NDREF injunction that great deference should be given to the educators as they're making these educational policy decisions. Finally, Your Honors, we're asking this court to affirm its decision in Campbell, which holds that a good faith mistake on placement does not rise to the level of intentional discrimination. Thank you, judges. Good morning, Your Honors. I'm Justin Gilbert. I'm from Chattanooga, and I represent an extraordinary young man named L.H. I'd like to talk to you this morning about what it meant for him to make progress first at a public school and then the slightly different argument about what it means to make progress in the private school where he was unilaterally placed. In the public school, I think you can read, or you can tell from reading Judge Collier's opinion, that an extraordinary amount of care was taken in crafting that decision. It is detailed, it is thorough, and for purposes of this court, it cannot possibly be clearly erroneous. In fact, it's clearly right. The evidence in the record that L.H. made progress in the public school in the mainstream classroom comes from the teachers, that is, the special education teacher, Ms. Hope. It comes from the case manager, Ms. Higgs. It comes from the progress reports that came home. It comes from the report cards. So there's no way Judge Collier's decision that he can make progress in the mainstream environment could be incorrect. As to my friend's arguments about the standard, whether it's substantial, meaningful, or whether that's wordplay, in Judge Collier's opinion itself, he found that L.H. made substantial progress. That's in the record at page 6217. He found that the child made appreciable progress. He found that it was abundantly clear, quote, that the child made progress. And if that were not enough, the school district took another stab at trying to show L.H. did not make enough progress after the Andrew F. case came out. Specifically, they filed a motion to reconsider under Andrew F., and Judge Collier came right back again and said, my decision is unchanged, for good reason. The Andrew F. case may have changed the standard in the Tenth Circuit, where it was, I think, only de minimis, but that's never been the standard here. Meaningful has been the standard here, and Judge Collier correctly found it on the first go-round, and he affirmed it on the second go-round. What I would like to spend some of my time talking to you about, which is particularly important to the parents, is what do parents of a child with special needs do when the public school says it will not give the supports in a mainstream class, and they're forced to find a place that will? What I mean by that is there's no dispute that the mainstream classroom, normal park, would not give him the very basic supports of over-learning and re-teaching and pre-teaching. That is kind of giving him a preview of what is to come, teaching him, and then giving him a review. So what do you do if you're the parents in that situation? You have to look at what your community offers, and under the case law, you have to try to find the supports that are available in your community that will help your child. These parents did extraordinarily well by their child. The Montessori school offered the child, and I want to go through these, a structured environment. If you're familiar with Montessori, classroom teachers who are not familiar, who come from the public school, may think it's just loosey-goosey, unstructured stuff, but it's actually not. It is tailored to specific grade levels. It is tailored to the Common Core in Tennessee, even though it doesn't have to be under the Florence County case. It is. And in L.H.'s class, there were only 18 kids, but three staff persons. That included the teacher, it included an aide assigned to all 18 kids, and at the parents' expense of $15,000 a year, which they paid themselves, it included a paraprofessional. So within this environment, L.H. can be guided to the appropriate levels for his individual needs. Let me ask you, is there anything in the record of any other alternatives besides Montessori that are out there that the county is saying that the parents should have considered? Judge Bush, there's nothing in the record about what the county said they should have considered. There is in the record the testimony of the mother, Debra, who talked about how she did canvass all the options in the county. She visited schools, and she interviewed the Montessori teachers, specifically the director, a lady named Bobbi Spink, who's been the director of the Montessori School in Chattanooga for 40 years, and she actually has a special education degree. So the mother gave testimony about why this was the appropriate placement. There's no other evidence of any other alternatives. I mean, if it's true that the child should have been mainstreamed at the public school, if that's the case, and the school's not allowing this child to be mainstreamed, then the parents have to have an alternative. And so Montessori is the one they chose. I guess I'm saying, is there anything else out there where someone's saying, oh, there's a better school than Montessori that you really should have put your child in to get this mainstreaming, other than the public school? No, Your Honor, there's not, and for good reason. There wouldn't be. I mean, this school has the small classroom. It has three people in there. It's tied to Common Core. It meets his needs very well. But to answer your question, no, there is no testimony in the record that here's a better mainstream opportunity. On this point that you're now talking about, what's at issue is whether the parents should have gotten reimbursed for the Montessori tuition and so forth. Now, my question, though, in that regard, that's clear. But did the court's ruling on this particular issue deprive them of anything else other than that reimbursement? Did the court's ruling deprive? The court's ruling deprived them? It's a yes or no question. The court's ruling set an important standard for when and if the child comes back to public school, he will be judged by the correct standard. That is, he won't have to meet. But that's standing, isn't it? Yes. So this whole issue in your cross-appeal really involves the dollars involved in reimbursement. It involves the relief. Yeah, thank you. Yes, it does, Your Honor. And what happened, I think, is that the public school people who have an interest in the case came into the Montessori school and gave a negative opinion of it. These were not independent experts. These were the public school people who were involved in a litigation. Pursuant to the IDEA, when the parents said, we can't allow this child to be segregated at the CDC, he needs to be mainstreamed, and the school said no. Correct me if I'm wrong, but the school was saying no. We're not going to keep him mainstreamed at Normal Park. What were the options that the parents had at that point? If they didn't put him in the Montessori school, was it solely the CDC? That would have been what the school demanded. There is a provision in the IDEA called the stay put, which in some cases allows the parents to demand that the child stay where he is pending a due process hearing. That's not appropriate in every case, and it wouldn't work here, because had the child stayed put, the public school made it clear that they were not going to provide him reteaching, pre-teaching, and over-learning, the basic supports that he needed. And so in order to get those supports, the parents did have to privately place. And they have that right. They don't have to exercise stay put. No, but that right is at their own financial risk. It is. Okay. So just so I'm clear about how this whole thing would have tracked, so if they had exercised stay put, it wouldn't have been with what he needed in a mainstream classroom, at least that's your position. The other option was to allow the school to put him in the CDC, where he would not have received the benefits of mainstreaming, or find some third alternative, which they then did. Right. Okay. And the point I would like to emphasize with that, Judge Batchelder, is that the parents found a place that he would be mainstream. There's this Berger case, B-E-R-G-E-R, out there that made the point of mainstreaming can't save an otherwise inappropriate private placement. That's not what we've got here. The parents put him in a school where he could be mainstream. He receives the powerful, immersive benefit of mainstreaming. And if there's any question about whether the mainstreaming at the Montessori school worked, the proof is in the pudding. Well, that raises another question, because as I read this record, as I understand it, it's the school's position that the evidence of progress that he was making at the Montessori school is simply not true, is not reliable. That is the school's position. The public school teachers barnstorm into the Montessori school and they give him these tests. He doesn't have his aid. He doesn't have any supports. He's confronted with these tests for the first time. It would be like someone coming to me and making me take off my glasses and say, take a test. I would do poorly because I don't have the mitigating measure or the supports I need. He needs a preview. He needs an aid. And he needs repetition. And that is what he was getting at the Montessori school. The better evidence of his progress is Dr. Whitbread's findings that he was almost to grade level by the time she examined him. He went all the way to Connecticut, and Dr. Whitbread specifically works with children with Down syndrome. She is the most knowledgeable person in the United States. I thought the school said that she didn't have any hands-on or in-depth information about him. I don't think they said that. I think they questioned whether she understood that he was somehow not a typical child with Down syndrome, but he flew to Connecticut and she tested him. He went through the clinic and all of that, and then she testified that he was, by the time she examined him, nearly on grade level by the time that he was in the Montessori classroom. And so it is indeed an important decision because parents of children with special needs who must find a school are not going to be able to recreate the perfect school, nor are they going to be able to recreate the public school. I'm wondering, is the standard for the effectiveness of the alternative school, should it really be determined at the end of the schooling or at the beginning of the schooling? Because the parent has to make a decision of where to send the kid, and they're not going to know what the results are going to be at the end of the schooling when they place the kid. They're going to have to make their best judgment at the time of where to put the kid. So I'm just wondering, as a matter of law, why is our standard, if it is indeed the standard, why are we looking at the end of the alternative schooling for the results as opposed to looking at the focal point being when the parent makes the decision to put the kid in the school? It's a great point, and I think maybe Judge Collier was looking at that temporal point as well. I was merely arguing the proof is in the pudding. I understand that, but that makes the whole argument irrelevant, quite frankly, because really it should be what information does the parent have when they make the decision to put the child in the alternative school, not the end of the schooling or what happened. But the parents didn't willy-nilly do it, remember. They did visit the Montessori school. The child did take time sampling it out. They do have a 40-year director with a special ed degree, and there is an 18-to-1 with three staff persons in the classroom. So those were things known on the front end, and it was a deliberate choice made on the front end. This is just a curiosity question, but what's happening to the young man while all of this is going on? He remained in the Montessori school. In fact, he's there today. He will begin eighth grade coming up, and once eighth grade is finished, that's as far as the Montessori school goes. So the parents will confront where he goes next, possibly returning to public school with the correct standard. Last two points I'd like to make very quickly is that under the Florence County case, even if Montessori is not perfect, partial reimbursement is frequently given, and the parents paid for this paraprofessional themselves, $15,000 one year, I think $9,000 another year. That could be a remedy given to these parents. It's not an all-or-nothing game. Last thing, Your Honors, in my 30 seconds remaining, is there is an adage in special education circles, special education is not a place. And what that means, relevant to this case, is that services and supports go to the child. The child should not have to be taken out to go to those supports. And in this case, the most basic, simple supports of over-learning, pre-teaching, and re-teaching can, in fact, be given in a mainstream environment, just as Judge Collier found. So for those reasons, we would ask the court, affirm Judge Collier's findings that mainstream was not delivered, respectfully reverse the findings that the Montessori school was not appropriate, given the overall circumstances. And if you prevailed on your cross-appeal, it would include the school district continuing to pay for the Montessori education. I think it possibly would. To be honest, I've not really researched that, Your Honor, because the Montessori school only goes through eighth grade. Okay, so it's close to the end. Right, right, yes. But that raises another question, which is that if the district court were upheld with regard to the mainstreaming issue, then if the child were returned to the public school, he would be mainstreamed. Yes. And that would have to be in a way that was beneficial to the child, not, as you indicated, if they exercised the state put, he would not have had what he needed in the mainstream classroom. You are correct. It would be, in a way, beneficial to the child. He would not have to keep up with non-disabled peers, and he would receive the supports he needs in the mainstream environment. Thank you. Thank you, Your Honors. Your Honors, very briefly, I'd like to make a handful of points. First, with regard to the issue of whether the judge used the correct standard, I think the judge himself is very clear on page 23 that he did not use the meaningful educational benefit standard. He notices the tension between the two, and then he goes on to analyze the social benefits of inclusion. And that's important because Andrew F. doesn't even speak to social benefits. As a matter of fact, this child didn't even have social goals in his IEP because he's so well socialized. So we have to understand at the outset that the judge himself recognizes he's not using the DEAL standard to decide a placement decision. Second, we need to understand, and this goes back to a question that Judge Guy asked during my main argument, what do we do with inclusion? And we need to understand that the purpose here, the aim of the school district, was not to put the child in CDC the entire day. The goal here was to put the child in only as much as was necessary to deliver core instruction. Your Honor, I see my time has expired. If I may have a moment to sum up. That's kind of interesting because you told us you wanted 60 seconds. I did say that. Nobody's ever told me that before. Well, you're right, Your Honor. And so mea culpa, if I may. Go ahead. If I may, the purpose here for the IDEA is the Individuals with Disabilities Education Act. It deals with individuals in education. And so we don't presume that the child fits into a profile because of a diagnosis. We don't imagine he is benefiting from inclusion because he's in the same geographical area. And we don't pretend he's making meaningful educational progress when he's clearly not. The IDEA demands more from districts, and frankly we owe students more than that as well. Did I understand you correctly to say that the language in Ronker had to be changed? Yes, Your Honor. Can this panel do that? Well, Your Honor, I think that this panel has to consider Deal. I think this panel has to consider NGUF. And that's the Supreme Court decision. We would have to assume that your premise is correct, which is that NGUF actually so undermines Ronker that it doesn't stand. Well, Your Honor, I think that NGUF says that. I think that NGUF takes the position that the standard used in Rowley, some benefit, was never intended to establish a substantive basis for FAPE. And that is actually what is being done when you apply the Ronker standard. You're looking at the sum benefit standard, and that is your substantive standard. NGUF makes clear that was never intended to be the substantive basis. And so NGUF, I agree that Deal, standing alone, would create a conflict that this panel by itself couldn't fix. But NGUF forces the issue, and that's what makes things different. Thank you, Your Honors. Thank you, counsel. The case will be submitted. Let me call the next case.